Anderson *v.* Larner Machine Company, Appellant.

Argued April 16, 1940. Before SCHAFFER, C. J., MAXEY, DREW, LINN, STERN and PATTERSON, JJ.

*Charles A. Wolfe* and *Robert T. McCracken,* of *Montgomery & McCracken,* for appellant.

*Thomas S. Lanard,* for appellee.

OPINION BY MR. JUSTICE LINN, June 24, 1940:

This was a bill for an account and royalty; the defense was that no royalty became payable until defendant had been reimbursed for all expenditures made by it in developing the invention, and that there was still a deficit. The learned court below ordered an account and at the audit found defendant indebted to plaintiff in an amount ordered to be paid. The decision depends on the meaning of the contracts made by the parties.

Plaintiff invented a profiling machine but had not the means to develop it. February 15, 1927, he made a contract with Edson S. Harris and Chester W. Larner granting to them "an option on an exclusive license to manufacture and sell said invention . . . said option to run for a period sufficient to enable" them (briefly) to satisfy themselves of its value. They exercised the option. They agreed to pay plaintiff a "royalty of ten (10) per cent of the selling price" on all machines sold by the licensee. The 13th paragraph provided "The Licensees agree to reimburse the Licensor (plaintiff) out of the net profits from their sales of said machines and as soon as said profits aggregate a sum sufficient for the purpose, for the expenditures made by the Licensor to date in the development of said machines, provided, however, that the total sum so paid shall in no event exceed five thousand dollars ($5,000.00)."

Messrs. Harris and Larner, the licensees, caused to be incorporated the Larner Machine Company, the appellant defendant, and, pursuant to a provision in the contract, assigned it to the corporation.

The relations of the parties were governed by the contract of 1927 until October 28, 1930, when they made another. This agreement provided that "The aforesaid

agreement of February 15, 1927 is hereby cancelled and terminated as of this date." An application for a patent had been made and plaintiff assigned his rights in it to defendant. This agreement provided a different method of compensating plaintiff from that specified in the first contract. Instead of a fixed percentage of the selling price of machines sold, they agreed to pay plaintiff from 30% to 48% of defendant's "net earnings . . . available for payment to its common stockholders."[1]

While this agreement was in force, the defendant, on December 16, 1931, made an agreement with The Cincinnati Milling Machine Co., by which, for $20,000, defendant assigned to the Cincinnati company all its rights etc. in the invention etc. The Cincinnati company agreed, in addition to the $20,000 payment, to pay specified rates of royalty; other terms need not now be stated.

By agreement of May 13, 1935, plaintiff and defendant again changed their relations. Plaintiff then assigned to defendant two patents both dated March 27, 1934, and repeated his former covenants to assign all patents for improvements or modifications on the machine. The

---

[1] The provision was: "Out of all net earnings of the Company derived from said profiling machines available for payment to its common stockholders the Company shall pay to the Patentee forty-eight per cent (48%) thereof, provided the total sum used by the Company in the development of the aforesaid machines, whether acquired by sale of stock or borrowed, shall not exceed Five Thousand Dollars ($5,000.00). In the event that the total of such sums exceeds Five Thousand Dollars ($5,000.00), the Patentee's share of net earnings shall be reduced one per cent (1%) for each One Thousand Dollars ($1,000.00) in excess of said Five Thousand Dollars ($5,000.00). For example, if the total sum aforesaid shall amount to Fifteen Thousand Dollars ($15,000.00) the Patentee's share shall be reduced from Forty-eight per cent (48%) to thirty-eight per cent (38%). It is agreed, however, that in no event shall the Patentee's share be reduced below thirty per cent (30%). No dividends shall be paid on the common stock of the Company unless and until the Patentee's share of the net profits available for dividends shall have been paid to him as aforesaid."

royalty was also changed by eliminating the sliding scale for determining the rate of royalty: "Out of all net earnings of Company derived from said profiling and contouring machines available for payment to its common stockholders, Company shall pay to Patentee thirty per cent (30%) thereof. No dividends shall be paid on the common stock of Company unless and until Patentee's share of the net profits available for dividends shall have been paid to him as aforesaid." Defendant agreed to render quarterly statements, and quarterly to pay royalty. They recited the agreement of October 28, 1930, and agreed that it should be cancelled and terminated.

Between February, 1927, and October, 1930, the company expended "for experimental models, patent attorneys, wages to Anderson and other expenses a sum in excess of Thirty-five Thousand ($35,000.00) Dollars, without having sold a single machine and without receiving a dollar of return upon its expenses."[2] The patent, which was applied for on August 1, 1927, was not granted until March 27, 1934.

When, in December, 1931, the defendant sold the invention etc. to the Cincinnati company it received $20,000 in cash and between that date and September 30, 1935, received the net sum of $1,499.18 as royalties from the Cincinnati company on the sale of 8 machines.[3] The defendant then sent to the plaintiff what it termed a "Royalty Report" showing the details resulting in that amount. In the report nothing was charged against that

---

[2] Quoted from appellant's brief.

[3] The total annual receipts from the Cincinnati company were:

| | |
|---|---:|
| 1932 | $ 836.31 |
| 1934 | 43.05 |
| 1935 | 1,818.96 |
| 1936 | 2,053.88 |
| 1937 | 5,640.98 |
| 1938 | 7,054.22 |
| Total | $ 17,447.40 |

sum for development expenses. When plaintiff received the report he telephoned defendant and asked when he would receive his 30% of it; he was informed that "he would have to wait until the Company made a profit." Shortly after, on November 12, 1935, defendant sent to him another report headed "Total Expenses a/c Anderson Profiler up to and Including Dec. 31, 1934" showing a deficit as of December 31, 1934, of $26,769.54."

It was a case for an account: *Curtis v. Serrill*, 303 Pa. 267, 271, 154 A. 487. The account covered transactions from 1927 into 1938. The contract of May 13, 1935, provided, as was stated above, that plaintiff should receive 30% of the net earnings derived by the defendant from his inventions "available for payment to its common stockholders." It is the meaning of that provision (also contained in the contract of 1930) as related to the transactions of these parties, that must be determined.

The argument of appellant is that it "had no net earnings available for the payment of dividends to its common stockholders." Referring to the contract of 1930, the brief states that neither party by that contract could have intended to "impose upon the appellant the obligation of absorbing without recovery or reimbursement all of its expenditures prior thereto. In fact, they clearly had the exactly opposite intention as is evidenced by the provisions of their agreement of October 28, 1930; for the earlier contract of February 15, 1927, gave Anderson a royalty of a certain proportion of the sales price of the machines whereas the contract of October 28, 1930, gave Anderson a proportion of the 'net earnings available for dividends,' which, as will be seen, could not exist until after the development and other expenses had first been reimbursed to the appellant."

We must construe the contracts as the parties made them. It is certain that in 1927 they did not provide for reimbursement of development expenses. The provision was just the other way. If they had intended,

by the contract of 1930, to provide that plaintiff should receive no royalty until after defendant had been reimbursed for development expenses made from 1927 to 1930, a sum in excess of $35,000, we think they would have said so by direct expression and not relied on implication.[4] The defendant had paid these expenses without any agreement for reimbursement before plaintiff's royalty became payable; there is no possible ground to imply a provision for recoupment. Plaintiff had been entitled to a percentage of the sale price and, in changing their relations in 1930, he agreed to receive less than was promised in the 1927 agreement; defendant, who by that time may, from its conduct, be presumed to have known that the machine had commercial value, received more by the new agreement. We do not think that the words "net earnings . . . available for payment" of dividends meant that an obligation to reimburse defendant should be created or, in other words, that defendant should have the right to recoup such expenditures before plaintiff should receive his royalty.

Defendant called an accountant who testified that defendant's books had been properly kept and that "since the incorporation of the appellant company in 1927 [it did not] . . . have a surplus consisting of net profits derived from the Anderson Profiling machine available for the payment of dividends to its stockholders, but that on the contrary, instead of net profits the appellant had sustained a deficit which on April 22, 1938, amounted to Seventeen Thousand Nine Hundred Sev-

---

[4] " 'Prima facie that which in any contract is left to be implied and need not be expressed is something so obvious that it goes without saying; so that, if, while the parties were making their bargain, an officious bystander were to suggest some express provision for it in their agreement, they would testily suppress him with a common "Oh, of course!" '

"At least it is true, I think, that, if a term were never implied by a judge unless it could pass that test, he could not be held to be wrong." MACKINNON, L. J., in *Shirlaw v. Southern Foundries*, [1939] 2 K.B. at page 227.

enty-Seven Dollars and Fifty-Seven Cents ($17,977.57)."
The witness also said that until the deficit "has been
eliminated by receipts of royalties from the Cincinnati
Company, there will be no 'net profits available for the
payment of dividends' in the appellant's hands out of
which any payments can be made to the appellee under
the contract." But that testimony does not aid the court
in determining the legal meaning of the contract. Of
course, the development expenses were a charge against
cash, but, after those expenditures were made, the de-
fendant had the patents and a valuable experimental
model to its credit which would tend to balance the ac-
count. By the sale to the Cincinnati company, it trans-
formed these assets into another form which it consid-
ered a proper equivalent and from which it is receiving
the benefit.

The Business Corporation Law of 1933, P. L. 364, at
page 404, section 701 (2) (c), 15 PS section 2852-701,
provides: "A corporation engaged solely or substan-
tially in the exploitation of mines, oil wells, gas wells,
patents, or other wasting assets, or organized solely or
substantially to liquidate specific assets, need not make
any deduction for the depletion of such assets by lapse
of time, consumption, liquidation, or exploitation in com-
puting the fund available for dividends, and such a cor-
poration may pay dividends from the net profits arising
from its business without deduction of such depletion,
subject, however, to the rights of shareholders of dif-
ferent classes." Compare: *Com. v. Ocean Oil Co.*, 59
Pa. 61, 63; *Com. v. Penn Gas Coal Co.*, 62 Pa. 241, 242;
*Com. v. Coal Co.*, 164 Pa. 284, 293, 30 A. 125; *Tully v.
Felton*, 177 Pa. 344, 355, 36 A. 285.

An excess of cash expenditures over cash receipts for
the whole period of corporate existence does not neces-
sarily result in a capital impairment where the expenses
have been incurred in increasing the value of corporate
assets. The phrase in the contract, as used by the par-
ties, did not mean that defendant should have its cash

assets restored and, in addition, have the patents or their equivalent and that, only after that, the defendant should pay the plaintiff something out of the net profits thereafter received.

The statement filed by defendant shows that, on this profiler account, there were net earnings available for dividends in the years 1931, and 1935 to 1938 inclusive. Whether dividends should be paid to the stockholders is of course for the board, subject to rules not now pertinent; but whether dividends were declared or not cannot affect plaintiff's right to receive royalty, if net earnings were made, as the statement shows.

As neither party complains of the amount required to be paid we need not deal with that subject.

The decree is affirmed, costs to be paid by appellant.